| | |
|---|---|
| RECLAIM THE RECORDS, ALEC FERRETTI, ALEX CALZARETH, and RICH VENEZIA<br><br>        Plaintiffs,<br><br> - against -<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>        Defendant. | 23 Civ. 01997 (PAE) |

## **DECLARATION OF ALEX CALZARETH**

  I, ALEX CALZARETH, hereby make the following declaration in support of Plaintiffs' cross-motion for summary judgment in the above-captioned case under 28 U.S.C. §1746.

  1. I am one of the Plaintiffs in this case. I am very familiar with the facts and circumstances of this action as a result of my participation in the activities leading up to the litigation and continuing in the case to this day. The statements made in this declaration are based on my personal knowledge, my review of the documents submitted and received in this case, and my review of additional agency documents as noted herein.

### **My genealogical activities**

  2. I am an experienced genealogist who has been researching my family history for more than 25 years. My maternal grandparents, and scores of their immediate and extended family members were refugees from the Nazis and became immigrants to the United States. Other relatives were part of the immigration waves earlier in the 20th century. In order to understand the history of these family members, including their flight from Europe and establishment of a life in the United States, I seek out historical documents located in US and overseas archives, as well as

records that are still in the custody of US Federal and State agencies. Although the broad strokes of history may be accessible through published books and articles, the stories of particular individuals rely on access to original records. Archives, such as the federal National Archives operated by the National Archives and Records Administration ("NARA") readily facilitate access to records the same day a request is made if one is in person, or at most within a few weeks. Records still at government agencies though involve a wait of months or years. The large number of immigrants within my family led me to make my first FOIA requests to USCIS's predecessor agency, Immigration and Naturalization Service ("INS") more than two decades ago.

3. In addition to my personal interest, I have volunteered my time to various genealogy organizations for many years. I serve as the head of the German Research Division of JewishGen, an organization dedicated to helping genealogists research their Jewish ancestry, and I am a board member of the Jewish Genealogy Society of Long Island. Through both of these positions I am familiar with hundreds of genealogists whose families have similar stories to mine and therefore who have similar records access needs. It is also this work that led me to become familiar with Reclaim The Records, which uses Freedom of Information laws to make historical records more accessible to the public. It may seem obvious, but in order to find records you have to first know what records exist. While the common perception may be that one just types a name into a genealogy database, such as those at Ancestry.com, and finds all the records, only a small percentage of historical records can be found that way. My decades of genealogy research have taught me that the key to successful research is understanding the history of records – why were they created and where are they located today.

4. While the key may be knowing where the records are, soon another question arises, of how can I access these records. When the records are at an archive, the answer is generally

straightforward: I can go in person to the archive or I can contact the archive and pay for a copy. However, if the records are still held by a Federal or State agency, it generally means access is going to be more difficult and time-consuming due to other barriers to access.

5. As a board member of Reclaim The Records, I work to understand records access issues for genealogists through conversations with members of the genealogy community and through collaboration with fellow board members, including Alec Ferretti. These conversations bring to light barriers to records access, which lead to requests under the Freedom of Information Act and state freedom of information laws.

6. Through this work Alec and I have learned that in order to make successful freedom of information requests for larger datasets of genealogically relevant information we need to understand how records came into existence, how they are stored today within agencies' record systems, whether any of the records have been digitized, and why the records are not already more widely available.

7. One of the first sets of records that we consult to learn about records within a federal agency are Record Control Schedules ("RCS"), which are NARA schedules that describe what will happen with specific agency records once they are no longer needed for agency purposes. Most records are temporary but a small percentage are designated for permanent preservation at NARA. We also consult agency System of Record Notices and Privacy Impact Assessments, which describe systems that contain personal information, and therefore may be useful in tracing the history of individuals that is done in the course of historical and genealogical research.

8. Record Control Schedules provide for the ultimate disposition of records, but do not detail exactly how the agency will accomplish the transfer of permanent records to NARA. For databases and large record systems with millions of physical files, such as Alien Files ("A-Files"),

only agency records can tell us the details of how an agency is carrying out the terms of the agreed-upon record control schedule, and we believe that somewhere within USCIS are records showing why the agency is years behind in transferring records to NARA.

9. Alec, Rich Venezia and I[1] are all long-time genealogists with recent immigrant ancestry. In addition, we all assist others in locating records relating to their immigrant ancestors, whether it be for purposes of dual citizenship or just for individuals who wish to understand the immigration story of their own families.[2] This means that Alec, Rich and I work together to understand the universe of historical records created relating to 20th century immigrants. This is synonymous with understanding the historical records of the INS and today USCIS.

10. Alec, Rich and I have discussed the aspects of historical immigration records on at least a weekly basis over the last several years. While historical passenger manifests have largely transferred to NARA, other records for immigrants and naturalized citizens prior to the mid-1950s are spread between NARA and USCIS. In some cases, USCIS maintains the indexes, while NARA maintains the records. Some indexes that have transferred to NARA point back to records that are still at USCIS. Record sets, such as A-Files, for individuals born more than 100 years ago should be at NARA[3], but are often not transferred for reasons we believe relate to decades of records management issues within INS and USCIS. The complex situation of early to mid-20th century records in this sphere mean that the three of us are in frequent contact regarding USCIS, its Genealogy Program and its FOIA program.

11. The discussions between Alec, Rich and I frequently touch on records access issues

---

[1] Throughout this declaration, I will use "Alec" and "Rich" to refer to Alec Ferretti and Rich Venezia, and "we" to refer to Alec Ferretti, Rich Venezia and myself.

[2] For the sake of convenience and given my familiarity with the record sets and request procedures, I have requested dozens of A-Files and Petition Files on behalf of fellow genealogists, such as my colleagues at the Jewish Genealogy Society of Long Island that I then share upon receipt of the responsive records.

[3] *See* https://www.uscis.gov/es/node/82198

within USCIS. Subjects include:

    a. FOIAs we believe are improperly denied for individual records, when the agency ignores proof of death;

    b. A-File FOIAs that cannot be fulfilled due to USCIS losing track of where the file is located;

    c. Our doubts about index searches including whether the agency has searched the proper index system (MiDAS vs CIS) and whether the agency searches are complete;

    d. Our understanding of the operation of the Genealogy Program, its large backlog, and how the Genealogy Program and FOIA program overlap and interact; and

    e. Our observations of USCIS's failure to adhere to NARA record control schedules.

12. These interactions among us lead us to work together to submit FOIA requests to USCIS to learn more about the agency's record-keeping practices, FOIA practices and the operations of the Genealogy Program

13. Alec, Rich and I are all interested in the outcome of these requests as we all seek answers to USCIS current record management and FOIA practices that hinder access to historical immigration records necessary to trace the histories of our own families and the families of those we assist in uncovering their own family histories.

### The present litigation

14. Timely access to records is essential for historical and genealogical research.

15. Alec, Rich and I are consistently frustrated by our experiences with USCIS as well as the long backlog in our FOIA requests and our Genealogy Program requests. Alec and I, as

board members of Reclaim the Records, and Rich as a founder of Records Not Revenue[4] and an expert on immigrant records, are heavily involved with the large field of genealogists and historians who are interested in records of 20th century immigrants. We serve as a resource to inform the public about what to expect when dealing with USCIS. In order to do that we need to receive information timely from USCIS. Since the *Nightingale* decision in December 2020, it seems to us that the urgency of meeting FOIA requests for A-Files has diminished resources for both FOIAs for operational records and for the Genealogy Program, which leads to an ever-increasing backlog of records requests. We seek additional records under FOIA so that instead of relying on speculation, we can have factual information that informs our positions.

16. My experience filing USCIS FOIAs for operating records in 2017 relating to specific agency decisions left me unsatisfied with the results, especially because they took more than two years to receive. This prompted me instead to rely on requests for searches of concrete systems, such as individual email accounts, limited to specific keywords but broader time ranges. However, the continued delay in producing these records means I and my colleagues can understand the context of agency decisions and actions only years later.

17. The FOIA requests included in this case can be grouped into four somewhat overlapping areas: FOIA Program Operations and Efficiency (23 requests[5]), the Genealogy Program and how it functions (25 requests[6]), the Records Management of USCIS record series relating to individual immigrants (38 requests[7]), and USCIS interactions with the National

---

[4] Records Not Revenue advocated against significant fee increases for the Genealogy Program that were proposed in 2019 and 2023, and for USCIS to follow its RCS and to reschedule important citizenship records, such as Petition Files and Certificate Files. *See* https://www.recordsnotrevenue.com/issues.

[5] Complaint, Requests number 2-4, 8-10, 20, 35-37, 40-41, 42, 47-49, 55, 58, 61, 66-67 and 73-75.

[6] Complaint, Requests number 5, 14-15, 17-19, 21-24, 28-29, 31, 34, 40, 50-52, 54, 56-57, 63-65 and 76.

[7] Complaint, Requests number 1, 6-7, 16, 25-27, 30, 32-33, 38-39, 43-46, 53, 59-60, 62, 68-72 and 77-89.

Association for Public Health Statistics and Information Systems ("NAPHSIS") (3 requests[8]). None of these requests were for A-Files.

*FOIA Program Operations and Efficiency*

18. These requests seek information on how the USCIS FOIA program operates – how the agency locates records or deals with records that cannot be located; what problems with locating responsive records come up regularly and are the subject of meetings among staff; how frequently requests are closed for reasons that may be improper, including improper redirects to the Genealogy Program.

19. In my experience, which is consistent with those of Alec and Rich, the USCIS FOIA program sometimes conducts searches in the wrong systems (as later confirmed by the FOIA Public Liaison's office), especially with the older records that are frequently the subject of my FOIA requests outside of this litigation. We have made requests for the training materials used for the older records system (such as MiDAS) and for other details about the use of the older systems in appropriate records searches.

20. We have requested copies of FOIA Logs, which allow us to check whether an agency is complying with the requirement under FOIA that agencies electronically publish records that have been requested 3 or more times.[9] FOIA logs create efficiencies, allowing requesters to see what other members of the public have asked for and received, and to request a copy of an already completed FOIA response rather than having the agency conduct a new search for the same records. I regularly check the agency's electronic reading room[10] for newly posted documents relating to A-Files of notable persons and other releases concerning records management and

---

[8] Complaint, Requests number 11-13.
[9] 5 U.S.C. § 552(a)(2)(D)(ii)(II)
[10] https://www.uscis.gov/records/electronic-reading-room

genealogy. However, my experience has been of agency inconsistency in posting these logs, particularly after March 2019, and of omitting the subject matter of the requests in those logs. My work with Alec, Rich and Reclaim the Records made use of the information in these logs, so these inconsistencies have resulted in our need to request them privately.

21. Rich, Alec and I have emailed questions regarding the agency's "no record" FOIA responses, but rarely receive useful information. Instead we must file new FOIA requests to obtain the processing notes for the requests or request the same records again, which often leads to the records being produced, but only several years after our initial request and the agency's "no record" response.

*The Genealogy Program and how it functions*

22. In 2008, the Department of Homeland Security used agency rule-making to establish the Genealogy Program ("GP"), charging a fee to people searching for historical genealogical records on a track separate from the usual FOIA process.[11] Once the program was established, the records covered by it were categorically excluded from FOIA processing[12], and in 2019 and again in 2023 the agency proposed significant fee increases for the use of this program.[13] All three of us (myself, Alec and Rich) have been attempting to obtain more information and understanding about the operation of this program, which we believe wrongfully excludes public records from FOIA release without proper Congressional authority.

23. Our requests in this category more specifically have sought to understand how

---

[11] https://www.federalregister.gov/documents/2008/05/15/E8-10651/establishment-of-a-genealogy-program

[12] *Id.*, at Chart 1 (" Chart 1 lists the records that the public would be able to request from the Genealogy Program versus the records that the public would be able to request from the FOIA/PA program.")

[13] 2019 proposal: https://www.federalregister.gov/d/2019-24366/p-772 ("Genealogy Requests—Genealogy Index Search Request Form G-1041 and Genealogy Record Request, Form G-1041A"); 2023 proposal: https://www.federalregister.gov/documents/2023/01/04/2022-27066/us-citizenship-and-immigration-services-fee-schedule-and-changes-to-certain-other-immigration ("U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements")

many people work at the GP, how much overlap there is between the GP and the USCIS FOIA department, how redaction decisions are made and by whom, and how many requests are received and processed for the different kinds of records covered by the GP (i.e., Alien Files, Certificate Files, Visa Files, Registry Files, and AR-2 forms). We also would like to understand why this program, which was intended to streamline the process and make it faster, has encountered a significant backlog over the last seven years.

24. It is our belief that the FOIA program is often quick to use the existence of the Genealogy Program to close out requests for documents that deal with "older records" instead of taking the time to understand the propriety of our requests. The Genealogy Program regulations clearly state the five series of records and specific date ranges that are part of this program.[14] However, on a very frequent basis, Rich, Alec and I receive FOIA denials in the form of redirect letters instructing us to contact the Genealogy Program. These denials are then upheld on appeal. The records sought are not within the Genealogy Program regulations, but will not be released under FOIA. I have continually encountered this kind of double-bind, including in requests made after filing the present action.

25. Our experience with the agency consistently providing incorrect referrals to the Genealogy Program motivates us to know what the underlying guidance is, and prompts our FOIA requests to try to determine where these polices are emanating from.

*Records Management*

26. My colleagues and I are generally in search of records that are much older than those made in most USCIS FOIA requests. While most agencies transfer records to the National

---

[14] *See* note 11, *supra*.

Archives and Records Administration (NARA) once the records are 30 years old or earlier,[15] many USCIS record series are retained for 75 years or more[16] so we are required to instead conduct our historical and genealogical research by requesting such records via FOIA rather than by a visit to NARA. A number of the requests in this case are for such material, database files that were supposed to transfer to NARA in 2006, 2009, 2012, 2014, 2017, 2019 and 2022[17], but none of which to date have legally transferred.

27. In my experience, and that of my co-plaintiffs, responses to requests for older records have suggested difficulties in the USCIS's maintaining, managing and searching their older records sets, so we have sought information to better understand these difficulties and how to navigate them. The primary issue behind these requests relates to the storage and retrieval of A-Files. The A-Files series began in 1944 and is still in use today. These files are scheduled for permanent retention and are supposed to transfer to the National Archives within a few years of an individual's 100th birthday.[18] USCIS operates a computerized index system, today called the

---

[15] *See* https://www.archives.gov/records-mgmt/bulletins/2020/2020-02 ("For permanent records, we typically approve records schedules with a retention period of between 15 and 30 years before transfer to the National Archives. All Federal agencies are required to transfer their permanent records to NARA at their scheduled disposition date in accordance with NARA regulations and Goal 1.4 of the OMB/NARA memorandum, Transition to Electronic Records (OMB/NARA M-19-21).")

[16] For USCIS: A-Files at up to 100 years: https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-08-011_sf115.pdf; Visa Files (75 years after closure of series): https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-04-003_sf115.pdf; MiDAS: Transfers upon individual turning 100 years old: https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-06-002_sf115.pdf

[17] MiDAS: https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-06-002_sf115.pdf, item 1b: 2006 initial transfer, 2012 next 5 years, and every 5 years thereafter (2017, 2022).

   CIS: https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-10-001_sf115.pdf, item 1b: 2009 (initial transfer), then 2014, and every 5 years thereafter (2019)

[18] *See* https://www.archives.gov/files/records-mgmt/rcs/schedules/departments/department-of-homeland-security/rg-0566/n1-566-08-011_sf115.pdf, p. 2.

Central Index System ("CIS"),[19] that indexes basic biographical data of immigrants. We are aware that there was a project called "Compaction" in which contractors retrieved boxes of A-Files stored at Federal Records Center so that the files could be input into CIS as well as the RAILS system, which tracks the physical location of files. Through responses to one of the FOIA requests at issue in this action (No. 82, received 227 working days after submitting the request), we learned that as of 2022, this project had not been completed, especially for the larger INS offices, such as New York. We believe this means that the exact locations of a significant number of files last used in the 1950s and 1960s are uncertain within USCIS systems. Another FOIA Request Response (No. 55, received 417 working days after submitting the request), shows examples of digitized cards that index A-Files in the MiDAS system, which cover pre-1975 records and reveals that those cards only show a field office location and a date, but do not include accession and box information. The ultimate outcome appears to be that the USCIS FOIA program marks files as missing due to these historical records management issues and that the files remain unavailable for transfer to NARA. Alec, Rich and I file FOIA requests to better understand both the scope of this problem and what USCIS does to try mitigate and manage it. By knowing which files are affected by these problems we can then work to adjust our future FOIA requests, such as by suggesting specific Federal Records Center accessions to be searched.

28. One of our main goals is to calculate the universe of A-Files in the pre-CIS, pre-mid-70s era. That is the reason that we need the database scrapes from CIS, MiDAS and RAILs, the subjects of Requests Nos. 69, 70, 71, and 86-89. Using a previously released CIS scrape that covers people born up to December 1918, I have been able to calculate that there were more than 1.7 million additional A-Files in USCIS custody that should have been transferred to NARA by

---

[19] *See* https://www.dhs.gov/publication/dhsuscispia-009-central-index-system

11

December 2018. Rich, I, and other members of the genealogy community also raised these specific issues with members of Congress to advocate for additional oversight of the agency and their record management functions. It is hard to present our case to elected officials and their staff when we need to rely on incomplete and stale data due to significantly delayed FOIA responses. By comparison, if we request an A-File from NARA, we will have the file within one or two weeks.

29. Finally, in order to better understand who is setting FOIA, Genealogy Program, and records management policies as well as how many staff members there are active in each area, we have submitted requests for organizational charts and contact information for employees charged with these matters. This will enable us to submit more targeted FOIA requests in the future for a smaller subset of USCIS employees.

*USCIS interactions with NAPHSIS*

30. The National Association for Public Health Statistics and Information Systems, or NAPHSIS, is a non-profit trade organization focused on the information management of health records.[20] In our work with Reclaim the Records in other contexts, we have encountered their efforts to lobby municipal health departments to close off public access to vital records (*i.e.*, birth, death, and marriage records), while privatizing the same information. Several of our FOIA requests in this case are intended to find out the extent to which USCIS makes use of NAPHSIS's services and to alert us to any potential partnerships between USCIS and NAPHSIS. With this information released through FOIA, Reclaim The Records can inform the genealogists, historians, and others interested in government records of what their Government is up to.

---

[20] *See* https://www.naphsis.org/about/what-we-do

**Other FOIA requests not part of this litigation**

31. As established, Alec, Rich and I have submitted many FOIA requests to USCIS for immigration records outside of the categories concerned in this action. According to our internal record-keeping,[21] 1,075 of the FOIA requests we submitted between June 26, 2019 and July 29, 2024 have been for documents called Petition Files or P-Files, which represent the working files of naturalization examiners, primarily from 1929 to 1950, but also extending back to 1906 in some cases. USCIS has maintained these records in Federal Records Centers ("FRC") for almost 75 years. They are an invaluable resource, especially for our research relating to the Italians and Germans naturalizing in the 1940s as enemy aliens. Despite the large volume of requests, each request provides specific accession and box information, meaning that USCIS's FOIA office should be able to place a reference request to the FRC, potentially more easily than requesting an historical A-File. Although most of the requests for P-Files are routed to the SIG (COW) queue, the materials contained within these files are essentially A-File material, as each file relates to one naturalization, and this file series closed in 1950 as naturalization examiners began instead to file their reports in A-Files.

32. Our experience with these requests has also been characterized by excessive delay and non-production of the requested documents for questionable reasons. Of the 1,075 P-file requests, 439 are backlogged as of September 27, 2024, and have an average of 234.9 working days since their submission. 636 of our P-file requests have been closed, with records produced in 470 of those requests, after an average of 248 days since submission. The 166 closed requests

---

[21] We have elected not to burden the Court with copies of each of these requests, but should the Court or opposing counsel wish to review my claims here, we have created a Dropbox repository with our tracking spreadsheet and copies of each of the acknowledgment emails, organized by request control number. *See* https://www.dropbox.com/scl/fo/brxgnogp1nmrtrs18oemd/AC9SJoV_Pe8tyRlq8wiq1hk?rlkey=9tvrtfu6ksavkrzjp6snlgw4m&st=iip8u1y5&dl=0 .

which did not produce records were closed after an average of 257 days.

33.     By comparison, we also made 508 requests for A-files during the same time period, June 26, 2019 to July 29, 2024. 504 of these have been closed, with records released in 297 of the requests. 68 of these requests pre-dated the *Nightingale* order, and were on average 83 working days old at the time of closure. For the 229 requests made after the *Nightingale* order, the requests were an average of 31 working days old at the time of closure.

### Administrative appeals not part of this litigation

34.     Alec, Rich and I filed 200 appeals in June 2023, using one joint appeal text, along with six of our colleagues relating to the release of hundreds of P-Files in March 2023. At that time P-Files were scheduled for eventual destruction instead of transfer to NARA, and we wanted to ensure that we had as complete a copy as possible of the information in the underlying records. For records that were all at least 73 years old, we believed that the agency was improperly applying b(7) redactions, and we were also able to provide additional proof of death for children, relatives, and witnesses so that their information could be revealed from under b(6) redactions. This kind of redaction is also the frequent reason for our appeals of the release of A-File materials. Until we receive the initial response, it is not always clear who will appear in an A-File, and upon our providing additional proof of death, USCIS will provide additional pages, as appropriate.

### Expectation of continuing delay by agency practices here

35.     I along with Alec and Rich will continue to file Freedom of Information Act requests with USCIS to understand the operations of USCIS including its record management programs, Genealogy Program and FOIA operations as long as there are historical records still at the agency and all the problems noted here continue. In 2020 I received a FOIA response after two years but my experience of the agency's trend for these kinds of operational documents now seems

to be production in three or four years. I have seen nothing from the agency, including its response to this lawsuit, that gives me hope that it will begin to process operational FOIA requests in 20 or 30 business days, or anything close to it. The agency timely processes hundreds of thousands of A-File FOIA requests pursuant to *Nightingale* but the much smaller, more traditional FOIA requests that shed light on agency operations are placed in its SIG queue, which can take years before producing responses. Without court intervention, I strongly anticipate USCIS's delays in the release of these records under FOIA to continue.

### Conclusion

36.     Although the persistence we devote to our records searches may come across in a *nudzh*-like manner (to use a term familiar to my ancestors), in no way are our requests made in a vexatious spirit. We are, admittedly, often vexed by the issues we perceive in the USCIS FOIA operation, in particular the lengthy delays but also the bleak horizon of agency blockages of access to records that would help us and the communities we work with better understand the history of immigration in this country through the documents of that history. Adding some daylight to this landscape is what we fundamentally seek to do in this action.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed in New York, New York on October 4, 2024.

_____
ALEX CALZARETH