**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECLAIM THE RECORDS, ALEC
FERRETTI, ALEX CALZARETH,
and RICH VENEZIA

                    Plaintiffs,

   - against -

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

                   Defendant.

**23 Civ. 01997 (PAE)**


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS, FOR SUMMARY JUDGMENT,**
**OR FOR SEVERANCE, AND IN SUPPORT OF PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**


October 4, 2024


BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiffs*

BENJAMIN MEYERS
E-mail: ben.meyers.esq@proton.me
*Of Counsel*

## Table of Contents

I. Preliminary Statement ................................................................................................ 1

II. Background ............................................................................................................... 2

    1.  The Freedom of Information Act ...................................................................... 2

    2.  Procedural History ........................................................................................... 4

III. Statement of Facts ................................................................................................... 4

IV. Argument ................................................................................................................. 8

    1.  This Court has jurisdiction to decide this case; Fed. R. Civ. P. 12(b)(1) dismissal is inappropriate ........................................................................................................ 8

    2.  Dismissal on Fed. R. Civ. P. 12(b)(6), failure to state a claim, is also inappropriate ....... 10

    3.  Summary Judgment should be denied for Defendant and granted for Plaintiffs ............. 15

        a)  Defendant's admitted conduct facially makes out a policy or practice claim ........... 16

        b)  Defendant does not show compliance with FOIA in SIG cases ................................. 18

    4.  Plaintiffs' claims should not be severed under Fed. R. Civ. P. 21 .................................. 22

V. Conclusion .............................................................................................................. 23

## Table of Authorities

**Cases**

*Amnesty Am. v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004)...........................................13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................................................16

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009)..............................................................11

*ASPCA v. APHIS*, 2021 U.S. Dist. LEXIS 57296, 2021 WL 1163627
 (S.D.N.Y., March 25, 2021)...........................................................................................................9

*ASPCA v. APHIS*, 60 F.4th 16 (2d Cir. 2023)...........................................................................8, 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................................11

*Cause of Action v. Eggleston*, 224 F.Supp.3d 63 (D.D.C. 2016)            ...........................................13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...........................................................................15

*Center for Biological Diversity v. Gutierrez*, 451 F. Supp. 2d 57 (D.D.C. 2006).......................14

*Citizens for Responsibility & Ethics in Washington v. FEC*,
711 F.3d 180, 187 (D.C. Circ. 2013) ...........................................................................................13

*Competitive Enter. Inst. V. EPA*, 153 F.Supp.3d 376 (D.D.C. 2016) ...........................................13

*Del Monte Fresh Produce v. US FDA*, 706 F.Supp.2d 116 (D.D.C. 2010)..................................14

*EPA v. Mink*, 410 U.S. 73 (1973) ...........................................................................................2, 23

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999)........................................16

*Int'l Refugee Assistance Project v. United States Citizenship & Immigrations Services*,
551 F.Supp.3d 136 (S.D.N.Y, July 22, 2021).................................................................................9

*Judicial Watch v. D.H.S.*, 895 F.3d 770 (D.C. Cir. 2018) ......................3, 8, 11, 12, 13, 17, 18, 23

*Mandala v. NTT Data, Inc.*, 88 F.4th 353 (2d Cir. 2023)..............................................................15

*Muttitt v. United State Central Command*, 813 F.Supp.2d 221, 229 (D.D.C. 2011)................9, 12

*National Archives and Records Administration v. Favish*, 541 U.S. 157 (2004) ......................2, 3

*Nightingale v. USCIS*, 507 F.Supp.3d 1193 (N.D. Cal.).....................................1, 7, 18, 19, 20, 22

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978).............................................................2

*NY Legal Assistance Group v. Bd. of Immigration Appeals*, 987 F.3d 207 (2d Cir. 2021)............8

*Payne Enterprises, Inc. v. United States*, 837 F.2d 486 (D.C.Cir. 1988) .....................9, 11, 12, 14

*Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) ...........................................16

*Public Employees for Envtl. Responsibility v. U.S. Dep't of Interior*,
2006 WL 3422484 (D.D.C. Nov. 28, 2006) ..................................................................................14

*Renegotiation Board v. Bannercraft*, 415 U.S. 1 (1974) ...............................................................8

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989)...........2

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962)......................................................................16

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)...........................16

**Statutes**

5 U.S.C. § 551(1) ............................................................................................................................3

5 U.S.C. § 552(a)(3)(A) ...................................................................................................................3

5 U.S.C. § 552(a)(6)(A)-(C) ...........................................................................................3, 11, 12, 18

5 U.S.C. § 552(f)(1) .........................................................................................................................3

**Rules**

Fed. R. Civ. P. 1 ............................................................................................................................23

Fed. R. Civ. P. 12(b)(1)....................................................................................................................8

Fed. R. Civ. P. 12(b)(6)................................................................................................8, 10, 11, 15

Fed. R. Civ. P.  56 ......................................................................................................................2, 15

## I. Preliminary Statement

Defendant United States Citizenship and Immigration Services ("USCIS", "the Agency", and "Defendant") has been under a continuing Federal court order issued in *Nightingale v. USCIS*, 507 F.Supp.3d 1193 (N.D. Cal., 2020), requiring it to meet its statutory deadlines when responding to Freedom of Information Act ("FOIA", the "Act") requests for Alien Registration Files ("A-Files") used in immigration hearings, to eliminate the backlog of unprocessed A-File requests, and to file quarterly reports on their compliance. The Agency has substantially complied with the order, making use of increased staff allocations and technological upgrades to achieve the ordered outcomes. Those efforts have not extended to meeting their deadlines in FOIA requests for other, *non*-A-File materials outside of *Nightingale*'s scope, which continue to suffer predictable and interminable delays.

Plaintiffs in the instant action are experienced genealogists who seek to improve public access to historical genealogical records, often through FOIA requests to USCIS. They frequently experience delays of a year or more, substantially longer than the 20 or 30 working days permitted by the statute. If responses do arrive, their lateness is often compounded by frequent errors, unjustified exemptions, and missing records. In an effort to understand why these problems happen, Plaintiffs requested records that would help explain how the USCIS FOIA program and its systems operate, effectively trying to use the FOIA process to shed light on the Agency's FOIA process, going to the very core of the Act's intent. These requests – 89 in total – went entirely without response for as long as three-and-a-half years prior to the filing of this action, and many remain unresponded to today. Plaintiff argues that these predictable and lengthy delays indicate a policy or practice of disregarding FOIA's strict determination deadlines, which has caused Plaintiffs to suffer ongoing violations of FOIA and will continue to do so until the Agency changes, or is required to change, their policy or practice.

Defendant's motion to dismiss on jurisdictional grounds seeks to radically limit the Court's inherent injunctive powers in FOIA cases, and should be denied. The thoroughness of Plaintiffs' Complaint and the inferences to be drawn from it push its allegations beyond the "feasibility" threshold, barring dismissal, and infirmities in the Defendant's submission render summary judgment for Defendant inappropriate. Conversely, Plaintiffs' showing of the Agency's informal policy or practice of willful disregard of inordinate, persistent delay makes summary judgment for Plaintiffs appropriate. Finally, severance of the 89 requests here involved would be detrimental to judicial economy and contrary to the just, speedy, and inexpensive determination of this action, and should not be permitted.

Plaintiffs, through undersigned counsel, pursuant to Rule 56, respectfully submit this Memorandum of Law in opposition to Defendant's Motion to Dismiss, for Summary Judgment, or for Severance ("Defendant's Motion"), and in support of Plaintiffs' Cross-motion for Summary Judgment ("Plaintiffs' Cross-motion").

## II. Background

### 1. The Freedom of Information Act

The "basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). It "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *EPA v. Mink*, 410 U.S. 73, 80 (1973). It is "often explained as a means for citizens to know 'what their Government is up to.'" *National Archives and Records Administration v. Favish*, 541 U.S. 157, 171-72 (2004) ("*NARA*"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting S. Rep. No. 89-813, at 3 (1965)). "This phrase should

not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *NARA*, 541 U.S. at 171-72. Pursuant to the FOIA, an agency "shall make [] records promptly available to any person" upon request, unless the records fall within nine categories of statutorily exempt material. 5 U.S.C. § 552(a)(3)(A). The USCIS is an agency subject to the FOIA. *Id*. §§ 551(1), 552(f)(1).

"It is the intent of [the FOIA] that the affected agencies be required to respond to inquiries…within specific time limits." H.R. Rep. No. 93-876, 93d Cong., 2d Sess. (1974) (cited in *Judicial Watch v. D.H.S.*, 895 F.3d 770, 785 (D.C. Cir. 2018)). The FOIA statute requires that upon receiving a request, each agency shall determine within 20 working days whether to comply with it (5 U.S.C. § 552(a)(6)(A)(i), and shall immediately notify the person making the request of the determination (*id*., §552(a)(6)(A)(i)(I)). In "unusual circumstances", this time limit for notification may be extended by written notice to the requestor, but by not more than ten working days (*id*., §552(a)(6)(B)(i)). These "unusual circumstances" are precisely defined in terms of the need to search for and collect records from off-site facilities, the need to review a voluminous amount of separate records, and the need to consult among other agencies or with other components of the same agency. *Id*., §552(a)(6)(B)(iii)(I-III). Finally, if an agency fails to meet these time limits, a requestor shall be deemed to have exhausted their administrative remedies with respect to the request, and if the Government can show both exceptional circumstances and due diligence on the part of the agency in responding to the request, a court may retain jurisdiction and allow the agency additional time to complete the review. *Id*., §552(a)(6)(C)(i). However, "exceptional circumstances" in this setting excludes delay resulting from a "predictable agency workload of requests", unless the agency demonstrates reasonable progress in reducing its backlog of pending requests. *Id*., §552(a)(6)(C)(ii).

2. **Procedural History**

Plaintiffs accept and respectfully refer the Court to the procedural history laid out in Defendant's Memorandum of Law ("Def. Mem.", Dkt. 41) at pp. 2-3.

### III. Statement of Facts

Plaintiffs Alec Ferretti and Alex Calzareth are board members of Reclaim the Records ("RtR"), a non-profit group of genealogists, historians, journalists, teachers, and open government advocates that acquires genealogical and archival data from government sources for the purpose of making such information freely accessible to the public. Plaintiff Rich Venezia is a genealogist and genealogical lecturer. Complaint, Dkt. 1, ¶ 12 ("Compl."); Declaration of Alex Calzareth ("Calzareth Decl."), ¶ 15. All three plaintiffs have recent immigrant ancestry, and work to assist others in their communities locate records that will help them understand the immigration stories of their own families. Calzareth Decl., ¶ 9. This means understanding "the universe of historical records relating to 20th century immigrants", including the records held by Defendant. *Id.*

Through RtR, Plaintiffs work "to understand records access issues for genealogists through conversations with members of the genealogy community and through collaboration with fellow board members." *Id.*, ¶ 5. Their discussions have brought to light barriers to records access, due to a "complex situation" around issues of records management regarding the locations of historical records and the indexes needed to find those records, with some maintained by the USCIS and others by the National Archive and Records Agency ("NARA"). *Id.*, ¶ 10. The Plaintiffs frequently discuss with each other access issues they encounter when requesting historical records held by USCIS, including FOIA denials Plaintiffs believe are improper, issues around the Agency's ability to locate requested records, issues with possibly incomplete or improper searches, and the Agency's failure to adhere to Record Control Schedules set by NARA for the transfer of historical records to the National Archive. *Id.*, ¶ 11. These discussions have led to the Plaintiffs' development

and submission of FOIA requests to USCIS to better understand the Agency's record-keeping practices and FOIA operational practices. *Id.*, ¶ 12.

Informed by these conversations, and frustrated by the limitations to their genealogical work caused by the lengthy delays of responses to requests for immigration records, *id.*, ¶ 15, Plaintiffs began seeking operational records from the Agency. Between June 18, 2019 and January 7, 2023, Plaintiffs submitted the 89 FOIA requests at issue in this litigation. Compl., ¶¶ 14-387.[1] None of the 89 requests made in the instant action were for A-Files (Calzareth Decl. ¶ 17), but sought information about the USCIS's policies or procedures relating to how the agency responds to FOIA requests. Specifically:

- Requests 1, 6-7, 16, 25-27, 30, 32-33, 38-39, 43-46, 53, 59-60, 62, 68-72 and 77-89 sought materials concerning the historical records management methods in use by the Agency. Calzareth Decl., ¶ 17; *see also id.,* ¶¶ 26-29 (discussing difficulties in obtaining requests for older records, including records intended to be used in petitioning members of Congress for greater oversight of these records management practices).

- Requests 2-4, 8-10, 20, 35-37, 40-41, 42, 47-49, 55, 58, 61, 66-67 and 73-75 were concerned with the Agency FOIA Program's operations and efficiency. *Id.*, ¶ 17; *see also id.,* ¶¶ 18-21 (providing background for requests for training materials, FOIA logs, and processing notes).

- Requests 5, 14-15, 17-19, 21-24, 28-29, 31, 34, 40, 50-52, 54, 56-57, 63-65 and 76 all concerned the Genealogy Program, a fee-for-service initiative to which Defendant has frequently directed Plaintiffs when denying their FOIA requests in pursuit of their genealogical

---

[1] For economy of space and consistent with the approach taken in Defendant's Memorandum (see p. 2, n. 2), we will use the Request Numbers herein and respectfully refer the Court to the corresponding Exhibit number of each Request enumerated in Plaintiff's Complaint at ¶¶ 14-387, where the text of each Request may be reviewed along with the acknowledgment letters received in reply.

research. *Id.*, ¶ 17; *see also id.,* ¶¶ 22-25 (describing background of the program and Plaintiffs' experiences with it).

- Requests 11-13 sought any information concerning the Agency's contact with NAPHSIS, an health information systems lobbying group. *Id.*, ¶¶ 17, 30.

Each request was promptly followed by a form letter from the Agency acknowledging receipt of the request. These acknowledgment letters assigned a three-letter and ten-digit Control Number to the request and stated which track (simple or complex) the request was being placed in. Of the 89 requests involved here, 12 were placed on the simple track, 73 were placed on the complex track, and four were not assigned a track. *See* Declaration of Benjamin Meyers ("Meyers Decl.") Exhibit ("Ex.") 1, FOIA request tracking chart ("Chart"). 88 of the 89 requests were given Control Numbers beginning with the prefix COW (referencing "Central Office Washington"), and the remaining request, concerning a contract, was given the prefix CNT. *Id.*

Following receipt of these acknowledgment letters, Plaintiffs heard nothing.[2] The Agency stood mute; it never requested additional time to respond, never gave any explanation for not responding, and never released any records whatsoever in response to these 89 requests until after Plaintiffs filed this action. Compl., ¶¶14-387; *see* Chart, Ex. 1.

Plaintiffs initiated this litigation on March 8, 2023. On the filing date, the number of working days since the date of submitting each request had grossly and unaccountably exceeded the statutory requirements. Requests Nos. 1-7 were in excess of 500 working days – two years – since the date of their submission. *See* Chart, Ex. 1. Requests Nos. 8-35 were between 408-499

---

[2] Plaintiff acknowledges that USCIS promptly followed Requests Nos. 7, 12, 13, 47, 50 and 81 with requests for clarification. The Complaint fully articulates how each of these requests for clarification received a prompt response, copies of which are included in the exhibits thereto. Notwithstanding these communication exchanges, Defendant failed to make timely notifications of its decisions or timely production in any of these FOIA Requests, and made no further communication whatsoever prior to the filing of the Complaint.

working days since submission. *Id*. Requests Nos. 36-53 were between 307-382 working days since submission. *Id*. Requests Nos. 54-61, between 257 and 283 working days, *id.*; Requests Nos. 62-68, between 101 and 201 working days, *id*; and Requests Nos. 69-89, between 41 and 88 working days, *id*. All told, the average time between making the request and filing the Complaint was 311.5 working days. *Id.*, p. 9.

Subsequent to the initiation of this action, Defendant began producing records beginning on July 31, 2023 for Requests 78 and 81 – which at the time of production were each 143 working days since submission – and as of September 30, 2024 has responded with production on 50 of the requests. 39 of the requests have still received no response. *Id.*

Over the course of the same time period of the requests at issue here, Plaintiffs have also continued submitting FOIA requests for immigration records, particularly Petition Files ("P-Files"), the working files used by naturalization examiners, primarily from 1929 to 1950 but also going back to 1906. Calzareth Decl., ¶ 31. Even though these requests included specific location, accession and box information, *id.*, the Agency's response has been "characterized by excessive delay and non-production of the requested documents", *id.,* ¶ 32, with an average production time of 248 working days where records were produced and 257 working days where records were not produced – just about exactly one year. *Id*. By comparison, for the 229 requests for A-File material Plaintiffs made after the *Nightingale* order, responses producing records were received on average 31 working days after receipt of the requests. *Id.*, ¶ 33.

Plaintiffs will continue to file FOIA requests with USCIS to better understand the operations of its FOIA Branch, Calzareth Decl. ¶ 35, but given the trends of increasing delay they have observed, they do not expect the Agency to adhere to the statutory deadlines absent court intervention. *Id.*

## IV. Argument

**1. This Court has jurisdiction to decide this case; Fed. R. Civ. P. 12(b)(1) dismissal is inappropriate**

Defendant argues, at Def. Mem. pp. 10-11, that the court's remedial powers in FOIA cases are limited to what is expressly articulated in the statute. This should be briskly rejected. Fifty years ago, the Supreme Court observed that "with the express vesting of equitable jurisdiction in the district court by [5 U.S.C.] §552(a), there is little to suggest … that Congress sought to limit the inherent powers of an equity court." *Renegotiation Board v. Bannercraft*, 415 U.S. 1, 20 (1974). *See also*, *NY Legal Assistance Group v. Bd. of Immigration Appeals*, 987 F.3d 207, 217 n.20 (2d Cir. 2021) ("Bannercraft … supports an expansive rather than a restrictive view of the remedies available to a FOIA plaintiff").

While the FOIA statute authorizes several express remedies – enjoining agencies from withholding agency records and ordering their production, examining the records to make determinations whether withholding is proper, assessing attorney fees, and initiating the process leading to disciplinary reviews in cases of individual impropriety – those powers are a floor, not a ceiling as to the court's sculpting of relief. *Judicial Watch v. D.H.S.*, 895 F.3d 770, 777 (D.C. Cir. 2018) ("*Judicial Watch*") ("This injunctive authority does not limit the district court's inherent injunctive powers", citing *Renegotiation Board*). Defendant places considerable reliance on the concurrence in *ASPCA v. APHIS*, 60 F.4th 16 (2d Cir. 2023) ("*ASPCA*"), in which Judge Menashi draws heavily from the dissent in *Judicial Watch*. But just as Judge Srivanasan failed to convince the other Appellate Justices on the *Judicial Watch* panel of this argument, Judge Menashi was the lone voice at the Second Circuit seeking to limit the court's power in this way. A statement in a concurrence does not constitute binding precedent, and the *ASPCA* concurrence should not bear on the Court's decision here.

The *per curiam* opinion in *ASPCA* affirmed the District Court's willingness to "assum[e] a 'policy and practice' claim is cognizable", 60 F.4th at 21, alongside the court's denial of the claim on other grounds – Congressional action had removed the possibility of ongoing violation. Judge Buchwald, in the Southern District, had agreed with the D.C. Circuit's analysis of the availability of broader equitable relief than what is outlined in the FOIA statute, and "join[ed] the other district courts in this Circuit in recognizing that FOIA policy and practice claims are justiciable." *ASPCA v. APHIS*, Civil Action No. 1:19-cv-3112-NRB, 2021 U.S. Dist. LEXIS 57296*, 2021 WL 1163627 at *38 (S.D.N.Y., March 25, 2021; Buchwald, D.J.).

Although Judge Buchwald was "not aware of any case in this Circuit in which a plaintiff has been granted relief on such a claim" (*id.* at *37-38), the Southern District decided such a case four months later in *Int'l Refugee Assistance Project v. United States Citizenship & Immigrations Services*. 551 F.Supp.3d 136 (S.D.N.Y, July 22, 2021) ("*IRAP*"). Relevant to the jurisdictional issues argued in Defendant's Memorandum, the *IRAP* Court squarely agreed that "where a plaintiff challenges an alleged pattern and practice of violating procedural requirements of FOIA in connection with the processing of the plaintiff's requests, the Court has the power under FOIA and *Payne Enterprises*[, *Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ("*Payne*")] to provide the requested declaratory and injunctive remedies." *Id*. at 165 (citing *Muttitt v. United State Central Command*, 813 F.Supp.2d 221, 229 (D.D.C. 2011)). It is surprising that Defendant here, who was also the defendant in the first Southern District case to grant relief to plaintiffs in a policy and practice claim, fails to mention the *IRAP* decision in its briefing.

Defendant launches an ad hominem attack on Plaintiffs at page 12 of its Memorandum, suggesting Plaintiffs may be using bad-faith requests in an effort to game the system in order to bring a policy or practice claim, and that squelching the Court's ability to hear such claims

somehow aligns with Congressional intent. This conspiratorial, contorted reasoning should not be taken seriously, but demands a response. If Plaintiffs were truly invested in such a scheme, they could file in the D.C. District Court, where the Agency is located and which has broadly recognized policy or practice claims for several decades. Plaintiffs did not do so, and are unaware of other genealogists who would undertake such an endeavor. Plaintiffs are motivated by more pressing concerns, such as trying to understand why the Agency operates in such a way that unsatisfactory, appealable and egregiously delayed responses are the consistent outcomes of their good-faith requests. *See* Calzareth Decl., ¶ 36.

Defendant's motion to dismiss on jurisdictional grounds should be dismissed.

## 2. Dismissal on Fed. R. Civ. P. 12(b)(6), failure to state a claim, is also inappropriate

Defendant argues that it is not "sufficiently outrageous" (Def. Memo. at 15) for USCIS to let more than 60 of Plaintiffs' FOIA requests, seeking information going to the core of Congress's intent in passing the FOIA, lay untended for a year or more with no detectable pulse from the Agency, despite the Complaint alleging that this was in connection with the Agency's adoption, endorsement or implementation of a policy or practice of failing or refusing to meet these procedural requirements. Compl. at §393. Plaintiff urges that this more than adequately fulfills their pleading requirement, and that this Court should and does have the judicial power to grant the declaratory and injunctive remedies requested in the Complaint.

"[A] plaintiff states a plausible policy or practice claim under *Payne* by alleging prolonged, unexplained delays in producing non-exempt records that could signal the agency has a policy or practice of ignoring FOIA's requirements. … [T]he plaintiff must allege a pattern of prolonged delay amounting to a persistent failure to adhere to FOIA's requirements and that the pattern of delay will interfere with its right under FOIA to promptly obtain non-exempt records from the

agency in the future." *Judicial Watch*, 895 F.3d at 780. The policy or practice may be "informal, rather than articulated in regulations or an official statement of policy." *Payne*, 837 F.2d at 491.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009) (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949.

Plaintiff's Complaint makes a more than plausible policy or practice claim. It challenges the Agency's policy or practice of failing to respond to records requests within the twenty-day timeframe required by 5 U.S.C. §552(a)(6)(A)(i), Compl., ¶ 3; that this policy or practice has harmed Plaintiffs by limiting their lawful access to information, *id.*, ¶ 5; and that this policy or practice will continue to cause the harm into the future, *id.*, ¶ 6; *see also id.,* ¶¶ 393-394. The statute does not require the *production* of responsive material in this time frame, nor does Plaintiff so claim. Plaintiff does claim that for each of the 89 individual requests identified and described in the Complaint at ¶¶ 14-387, Defendant repeatedly violated the statute requiring determination and notification, when Defendant failed to notify Plaintiffs of a determination of their decision whether to produce records within 20 days, 30 days, or at all until this litigation was brought, and at ¶ 393 attributes these violations to a policy or practice of failing "to respond to Plaintiffs' requests or

clarifications … within the time period required by FOIA". These are not threadbare assertions; these provide more than sufficient granularity to survive dismissal.

Plaintiffs' Complaint should survive dismissal not only on the number of violations alleged, but on the magnitude of their depth. In reviewing the number of working days from the dates of each request as stated in the Complaint to the date of the Complaint itself, the Court may consider that on average, each request was over 300 working days old – more than a year past its statutory deadline without a statutorily required response (*see* Ex. 1, p. 9), and that 42, or nearly half, of the requests were more than 375 working days (1.5 years) past their submission date. *Id.* Certainly, Congress did not approve of such dereliction of duty when it rejected a 30-day extension provision in the 1974 FOIA Amendments in favor of the ten-day extension for "unusual circumstances" in 5 U.S.C. 552(a)(6)(B); *see Judicial Watch*, 895 F.3d at 781 ("The 1974 Amendments were deliberately drafted to *force increased expedition* in the handling of FOIA requests") (emphasis in original; citation omitted), and nor should it be approved by this Court.

Plaintiff attributes this extensive and egregious delay to a policy or practice on the part of the Agency at ¶¶ 3, 393, and 398 of the Complaint. Plaintiffs need not allege the presence of a *formal* practice, regulation of official statement of policy (*Payne*, 837 F.2d at 491), nor should it be required to do so, given Plaintiffs' limited knowledge of the operative workings of the Agency (limited in part due to Defendant's dilatory practice in precisely the requests made here, seeking records concerning the operative workings of the Agency's FOIA department). "Very rarely do requesters ever know of an agency's activities behind the scenes of a request prior to litigation." *Muttitt v. U.S. Cent. Command*, 813 F.Supp.2d 221, 230 (D.D.C. 2011) (echoing Circuit Judge Sotomayor, in a different context: "It is unlikely that a plaintiff would have information about the city's training program or about the cause of the misconduct at the pleading stage, and therefore

need only plead that the city's failure to train caused the constitutional violation", *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 n.10 (2d Cir. 2004)).

The Complaint at ¶¶ 14-387 makes out a lengthy, consistent pattern of extended delay in violation of the statute amounting to substantially more than "mere delay" (Def. Mem. at 18), and considerably beyond the "several months" the dissent in *Judicial Watch* would permit (*see* Def. Memo at 11), but rather alleges years of the Defendant providing neither confirmation nor a denial in dozens of Plaintiffs' requests in violation of the statute. "[T]he statute does not condone agency personnel sitting behind accumulating mounds of FOIA requests and requiring each requester to 'take a number' and wait many months or years for the agency to comply." *Judicial Watch*, 895 F.3d at 789. "Although the agency may desire to keep FOIA requests bottled up in limbo for months or years on end, the statute simply does not countenance such a system." *Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180, 187 (D.C. Circ. 2013).

The cases cited at pp. 15-16 of Defendant's brief fail to capture the scale of delay in this case. In *Eggleston*, the court dismissed the claim where only a single FOIA request subject to the purported policy or practice had been submitted by the defendant, rather than by non-parties to the case, and the court properly held that "Plaintiff cannot state a policy or practice claim based on a single incident ... an isolated action". *Cause of Action v. Eggleston*, 224 F.Supp.3d 63, 71-72 (D.D.C. 2016). The controversy in *Competitive Enter. Inst. v. EPA,* 153 F.Supp.3d 376 (D.D.C. 2016) concerned the slow timetable of defendant's rolling production in response to plaintiff's single FOIA request, which production was complete by the time of the decision, thereby mooting the "pattern or practice" claim as there was no risk of future wrongdoing. *Id.* at 384-85. The plaintiff in *Center for Biological Diversity v. Gutierrez*, 451 F. Supp. 2d 57 (D.D.C. 2006), brought their case alleging a pattern and practice of untimeliness under the Administrative Procedure Act

("APA"), based on two FOIA responses that were two weeks and 50 days late, respectively, *id.* at 69; the court cited *Payne* in denying the government's motion to dismiss on mootness grounds. *Id.* at 70. *Del Monte Fresh Produce v. US FDA*, 706 F.Supp.2d 116 (D.D.C. 2010), particularly lacks relevance here, as it is an APA pattern and practice case alleging that the agency had allowed too much time to pass before completing inspections of the plaintiff's fruit produce – not records subject to the FOIA, *id.* at 118 – and the court cited *Payne* in making this distinction between regulatory agency action and actions challenged under FOIA. *Id*. at 120. The plaintiffs in *Public Employees for Envtl. Responsibility v. U.S. Dep't of Interior*, 2006 WL 3422484 (D.D.C. Nov. 28, 2006), made a policy or practice claim based on a five-month delay in production on a single FOIA request; the court denied the claim, stating that "while the Court does not excuse DOI's five-month delay in responding to PEER's FOIA request, *a sole incident of delay* is insufficient to convince this Court that there exists a 'reasonable expectation that the alleged violation will recur.'" *Id*., citing *Payne*, 837 F.2d at 491-92 (emphasis added).

As to the future harm element, Plaintiffs' allegation in the Complaint at ¶ 394 ("Plaintiffs… will continue to be irreparably harmed unless Defendant is compelled to process Plaintiffs' 89 enumerated Requests and fully comply with FOIA's procedural requirements") is buttressed by the fact that as of the date of this writing, Defendant continues violating the statute through non-production of the requested materials (Def. Mem. at 6, "41 of the 89 FOIA requests have been completed"), and Plaintiffs continue to suffer harm in this non-response. Beyond the contours of this lawsuit as well, Plaintiffs keep making requests and receiving grossly untimely responses, if any. This is confirmed in Defendant's papers, observing that Plaintiffs have continued submitting requests since filing the Complaint, to which Defendant has responded to only 44% in the statutory time. Declaration of James Baxley ("Baxley Decl.", Dkt. 42), p. 15, n.3, ¶ 58. *See also* Calzareth

Decl., ¶ 35. An order requiring Defendant to respond to the outstanding requests herein without explicitly enjoining Defendant from continuing their practice of violating these procedural requirements (*see* Compl., p. 47, Request for Relief, item H) would do little to uncork the Agency bottleneck when Plaintiffs, and other requestors in the SIG queue,[3] are also waiting for overdue responses on a great number of newer requests.

Plaintiffs have plausibly alleged a persistent practice of delay that violates FOIA's determination deadline requirement. However, should the Defendant's motion to dismiss be granted in any aspect, Plaintiffs respectfully request the opportunity to re-plead the dismissed portion of their Complaint. *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023) ("[I]n the absence of a valid rationale like undue delay or futility, it is improper to simultaneously dismiss a complaint with prejudice under Rule 12(b)(6) and deny leave to amend when the district court has not adequately informed the plaintiffs of its view of the complaint's deficiencies.")

### 3. Summary Judgment should be denied for Defendant and granted for Plaintiffs

Defendant's motion for summary judgment should be denied because Defendant fails to show that the Agency has complied with FOIA's timing requirements in processing Plaintiffs' requests. Def. Mem. at 17-20. Plaintiffs' cross-motion should be granted because there is no question that the agency's policy and practice permitted the egregious violation of the determination and notification deadlines in the FOIA statute, causing harm to Plaintiffs which will continue into the future.

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary

---

[3] *See* discussion of high percentage (48%) of SIG-queue requests in backlog, p. 20-22, *infra*.

judgment and assessing whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) (inferences to be drawn from the underlying facts revealed in materials such as affidavits, exhibits, and depositions, must be viewed in the light most favorable to the party opposing the motion). "A district court in a FOIA case may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (citation omitted).

It is the initial burden of a movant to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief as a matter of law. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). The non-movant carries only "a limited burden of production," but "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).

### a) Defendant's admitted conduct facially makes out a policy or practice claim

Plaintiff struggles to comprehend how an Agency that "has abided by its established process" (Def. Mem. at 19) and "has made every effort to respond to all of Plaintiffs' requests as quickly as possible" (*id.*) and "*within the statutory time frames*" (*id.* at 18, emphasis added) can also have the record established here: responding at all to only "41 of 89 FOIA requests at issue" (*id.* at 19), and each of those in gross violation of the statutory timeframes. Plaintiff submits that

the only way these statements can be consistent is if the "established process" alluded to includes an informal policy in which inordinate delay is disregarded and lengthy violations of the statute are willingly abided. "Informal agency conduct resulting in long delays in making requested non-exempt records available may serve as the basis for a policy or practice claim", *Judicial Watch*, 895 F.3d at 777-78. There is no other way to reconcile the Agency's delay in the 89 FOIA requests at issue here. Further evidence of the Agency's pattern of egregious delay is shown by the Agency's lethargy in responding to Plaintiffs' other FOIA requests. *See* Calzareth Decl. at ¶¶ 31-32 (describing "excessive delay and non-production of the requested documents for questionable reasons", with responses made to hundreds of requests for immigration records only after a year or more of delay).

The Baxley Declaration describes processing steps at ¶¶ 34-35 – consultations, outside referral, and following leads – which it acknowledges "may result in *additional* delays" (*id.*, ¶ 35; emphasis added) and states that this has increased the delays "for *some* of the 89 requests" (*id.*, ¶56). Plaintiff argues that this kind of open-ended timing approach to its FOIA responses, permitting delays of hundreds of days beyond the statutory requirements, runs counter to Defendant's obligation under the law to determine its responses to requests within the statutory time frames.

Defendant's papers do not suggest it has a plan that would concretely reduce the processing time and existing backlog for non-A-File FOIA requests. *See Judicial Watch*, 895 F.3d at 784 (stating that, on remand, the agency "should confirm how it intends in the future to conform to FOIA's mandate to make requested non-exempt records 'promptly available'"). With no such plan in place, Plaintiffs (and other requestors) will continue suffering from the extreme delays flowing from the Agency's practice.

Showing both an informal policy or practice of willful disregard of inordinate delay and the likelihood of continued harm, Plaintiffs' allegations here make out the necessary elements of a policy and practice claim, and on this basis alone, Plaintiffs' cross-motion for summary judgment should be granted.

### b) **Defendant does not show compliance with FOIA in SIG cases**

The FOIA statute envisions that more time may sometimes be required to respond to certain requests, and permits a district court to "retain jurisdiction to allow the agency additional time to complete its review", 5 U.S.C. §552(a)(6)(C)(i), but only upon a showing that "exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." *Id.* Defendant fails both required demonstrations. Defendant has not articulated what exceptional circumstances purportedly exist, and it is "emphatically" not permissible for a court "simply to assume that an agency's circumstances are 'exceptional'." *Judicial Watch*, 895 F.3d at 789. More consequentially, the Agency's discussion of its purported due diligence lacks any specificity about how its efforts apply, if at all, to the non-A-File requests at issue here.

Defendant's papers make much of the increased overall number of FOIA requests the Agency received between Fiscal Year ("FY") 2020 and FY 2023, and its efforts to provide timely responses to the vast majority of these. Def. Mem. at 4-5, 18-19; Baxley Decl., ¶¶ 17-19. This, however, is only part of the story. Defendant omits any reference to *Nightingale v. USCIS*, a FOIA policy and practice case in the Northern District of California decided on December 17, 2020, granting summary judgment in favor of non-citizen and immigration-attorney plaintiffs challenging the same defendant here for their failure to meet FOIA's statutory deadlines in immigration cases. *Nightingale v. USCIS*, 507 F.Supp.3d 1193, 1195-96 (N.D. Cal., December 17, 2020; Orrick, D.J.). That court issued declaratory and injunctive relief to those plaintiffs, ordering USCIS to permanently adhere to the statutory deadlines in processing FOIA requests for A-Files,

to eliminate all backlogs on A-File requests within 60 days of the order, and to provide quarterly progress reporting to the court regarding the number and percentage of A-File requests timely met and the number and percentage that remained pending beyond their statutory deadline. *Id.* at 1213-14.

While *Nightingale* is not binding authority on this Court, it most definitely is binding on this Defendant, and the consequences of the *Nightingale* order intertwine with the issues in this case in three ways: it explains the increase in FOIA requests to the Agency, but only for A-Files; it complicates the record as to the diminished backlog; and it creates questions as to how Agency resources were allocated to handle this increase beginning in 2021.

**Increased A-File requests:** After the order made it feasible for non-citizens with immigration hearings and their attorneys to timely obtain the records needed to properly prepare for those hearings, the number of requests for A-File records increased significantly. The *Nightingale* order applied to the Agency defendants nationally, so non-citizens in every U.S. immigration court – not only in the Northern District of California – were able to make FOIA requests, beginning on December 18, 2020, with the certainty of a timely response. Without doubt, this prompted the increased number of requests cited in Defendant's papers here, Def. Mem. at 18, which are consistent with the quarterly reports filed in *Nightingale*. Those reports show that the number of requests for A-Files received by the Agency tripled, from approximately 49,001 in the first quarter of 2021, to 151,961 in the first quarter of 2024. See Meyers Decl., ¶¶ 4-5 and Table 1 (collecting *Nightingale* reporting through 9/16/2024).

A-File requests are handled by the USCIS FOIA Branch Records Disclosure section (Baxley Decl., ¶ 14) and Customer Service Section (*id.*, ¶ 15). However, none of the requests made in the instant action were for A-Files (Calzareth Decl. ¶ 17), and were accordingly handled by the

19

Significant Interest Group ("SIG"), which is responsible for primarily non-A-File requests. Baxley Decl. ¶¶ 2, 6, 11, 24 ("non A-file material … is generally assigned to the SIG section.").

Defendant has not specified what portion of the surge of increased requests in recent years have been for non-A-Files, or if there has been an increase at all, suggesting that it may be using the increase in A-File requests to cloak inefficiencies in the operation of the SIG section. Defendant has not shown that there were an increased number of non-A-File requests to process which would explain the delinquency of the FOIA requests in this case. "Ninety-nine percent of the total FOIA requests that USCIS receives are A-File FOIA requests that 'account for the largest portion of DHS's FOIA backlog."[4] *Nightingale*, 507 F.Supp.3d at 1202 (citing the deposition of Tammy Meckley, then-Associate Director of Immigration Records and Identity Services Directorate). Looking only at the number of non-A-File requests received from 2020 through 2023, and proportionately reducing the numbers alleged by Defendant here by 99%, render a very different story, and raise questions about the accuracy, as well as the good faith basis, of Defendant's presentation here.

**Uncertain data re FOIA backlog:** Defendant also cites to the reduction of its FOIA backlog, from 20,344 requests at the end of FY20 to 2,137 requests at the end of FY23, as a measure of its diligent efforts to diminish this backlog. Def. Mem. at 4-5; Baxley Decl., ¶ 19. However, the same lack of specificity as to the number of non-A-File requests also applies to the size and reduction of the request backlog, and without providing that data, Defendant says nothing about the actual number of backlogged requests in the SIG section. Because all of the requests at

---

[4] Plaintiffs' review of the FY23 raw data indicate that Ms. Meckley was using "99%" with precision, and not in a rhetorical or figurative sense. See Meyers Decl. ¶¶ 7-9 and Table 2, showing 4,177 records in FY23 raw data with "COW" prefix, out of 417,890 total records, or 1%.

issue here were being handled by the SIG section, that is the only useful comparison, but one the Defendant has not provided.

Defendant does confirm that 2,137 total requests were backlogged at the end of FY23. Def. Mem. at 5; Baxley Decl., ¶ 19. The raw data for FY23 published by the Department of Homeland Security permit a viewer to see which requests were backlogged, and what control number prefixes they used. See Meyers Decl. at ¶ 9 and Table 2. That data shows that 2,006 out of the 2,137 backlogged requests, or almost 94%, had a "COW" prefix in their control number; 76 (3.5%) had an "NRC" prefix; and 49 (2.3%) a "PFL" prefix. *Id.* Because 88 of Plaintiffs' 89 FOIA request control numbers also bore a COW prefix, we may infer that the COW prefix indicates non-A-File requests, like Plaintiffs', that are handled by the SIG section.[5] The FY23 raw data also shows that 4,177 request control numbers in the raw data table had a COW prefix, meaning that 2,006 out of 4,177 – 48% – of these SIG requests were backlogged. *Id.*

The raw data also confirms that a large percentage of those 2,006 backlogged requests were chronically overdue, with 605 of the requests open for 500 or more working days, and 92 for 1,000 or more working days. *Id.*, ¶¶ 10-11 and Table 3. This cannot be within the scope of how Congress intended the Act to operate.

Defendant's failure to specify the number of SIG-section requests that were backlogged in the fiscal years 2020-2023 means it has not met its burden to show whether staffing or technology changes have actually affected the SIG-section backlog where the 89 requests at issue here were awaiting action. A 48% backlog rate of such significant burden within a single FOIA processing section indicates a structural problem, not to be dismissed by statistical generalizations. Defendant

---

[5] This inference is supported by internal USCIS FOIA training documents provided through a different FOIA lawsuit, instructing case processors to move SIG requests into the COW queue. See Meyers Decl. ¶¶ 12-14 and exhibits therein.

has not met its burden and its motion should be denied on the basis of Defendant's unspecific and general claims to have undertaken diligent efforts to fix a chronic problem.

**No indication of increased allocation of resources to SIG unit:** Defendant credits increased staffing and overtime for its efficient processing of its increase and the reduction of its backlog. Def. Mem. pp. 18-19. But like the number of requests and the size of the backlog, there is no distinction made as to how those increases were allocated across the various divisions of the USCIS FOIA Branch, and reason to believe that all of it was directed at processing the increase in A-File requests. In Tammy Meckley's June 15, 2023 Declaration to the *Nightingale* court, she stated that "[s]ince January 2022, USCIS has authorized the hiring of 83 additional positions to support the FOIA program" (Meyers Decl., Ex. 2, ¶ 12). It may be inferred that these positions were intended to assist in complying with the *Nightingale* order, which was the subject of that declaration, and thus directed towards handling A-File requests. Defendant here recites the same figure, word-for-word, at Def. Memo, p. 18 and the Baxley Decl., ¶ 42. It would be misleading to credit staffing allocations made to the USCIS FOIA Branch sections dealing with A-File requests for any reduction of the SIG section backlog, but that seems to be Defendant's position here.

Defendant's reliance on improvements mandated under *Nightingale* do not show any diligent efforts to improve their responsiveness to any of Plaintiffs' non-A-File requests, or for that matter to the other requestors patiently waiting in the SIG processing queue. Defendant has not met its burden, which should result in a denial of Defendant's motion, and Plaintiffs' showing of an informal policy or practice of willful disregard of inordinate delay and the likelihood of continued harm should result in summary judgment for Plaintiffs.

## 4. Plaintiffs' claims should not be severed under Fed. R. Civ. P. 21

Plaintiffs, through these 89 requests submitted over three and a half years, have made good-faith efforts to better understand the reasons for the Agency's poor performance in responding to

Plaintiffs' other requests. *See* Calzareth Decl., ¶¶ 14-30. The present action is not an effort to "shoe-horn" disparate requests; the requests here are closely related in their mission to better understand the agency's FOIA policies and modes of operation, in order for Plaintiffs to better achieve the very purpose of the Act: "access to official information long shielded unnecessarily from public view and […] to secure such information from possibly unwilling official hands." *EPA v.* Mink, 410 U.S. 73, 80 (1973). This is not being done in a vexatious spirit, but to help Plaintiffs and their communities "better understand the history of immigration in this country through the documents of that history." Calzareth Decl. at 36.

Severance of the 89 requests into individual claims would secure neither a just, speedy or inexpensive determination of these claims. Fed. R. Civ. P. 1. It would frustrate judicial economy by requiring 89 different cases to be entered into the Federal docket, each with its own individual burden on the court. It would be considerably more expensive for Plaintiffs to file and litigate 89 individual claims, illustrating "the chilling effect that litigation costs can have on members of the public much less the burden imposed on the courts." *Judicial Watch*, 895 F.3d at 780. Defendant's motion to sever should be denied.

**V. Conclusion**

Defendant's failure to respond to Plaintiffs' 89 FOIA requests for years at a time without demonstrating diligent efforts to remedy the issues causing the delay shows a policy or practice of disregard for its violations of the FOIA statute, which will continue to harm these Plaintiffs and others absent Court intervention. For the reasons shown above, Defendant's motions should be dismissed and Plaintiffs' cross-motion should be granted. Plaintiffs respectfully request the Court declare the USCIS has a policy and practice of violating the FOIA through their excessive delays in responding to FOIA requests, order the Defendant to promptly provide the requested documents, and issue any other such relief as the Court deems appropriate.

Dated:      October 4, 2024
            New York, New York

                        Respectfully submitted,

                        BELDOCK LEVINE & HOFFMAN, LLP
                        99 Park Avenue, PH/26th Floor
                        New York, New York 10016
                        *Attorneys for Plaintiff*

                        By:

                        Benjamin Meyers, Of Counsel
                        t: 646-496-2353
                        e: ben.meyers.esq@proton.me

                        David B. Rankin
                        t: 212-277-5825
                        e: drankin@blhny.com