UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECLAIM THE RECORDS, ALEC
FERRETTI, ALEX CALZARETH,
and RICH VENEZIA

                      Plaintiffs,

- against -

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

                      Defendant.

23 Civ. 01997 (PAE)

**PLAINTIFFS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

December 6, 2024

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiffs*

BENJAMIN MEYERS
E-mail: ben.meyers.esq@proton.me
*Of Counsel*

## Table of Contents

I. Preliminary Statement ................................................................................................ 1

II. Argument.................................................................................................................... 1

    1. This Court has jurisdiction to decide this case........................................................ 1

    2. Dismissal of Plaintiffs' complaint is inappropriate ................................................. 4

    3. Summary Judgment should be denied for Defendant and granted for Plaintiffs................ 4

    4. Plaintiffs' claims should not be severed ................................................................ 10

III. Conclusion ............................................................................................................... 10

## Table of Authorities

**Cases**

*ASPCA v. APHIS*, 60 F.4th 16 (2d Cir. 2023)..................................................................2

*Brown v. Pleta,* 563 US 493 (2011)...................................................................................2

*Citizens for Responsibility & Ethics in Washington v. FEC*, 711 F.3d 180 (D.C. Circ. 2013) .......6

*Elec. Privacy Inf. Ctr. v. DOJ*, 15 F.Supp.3d 32 (D.D.C. 2014) ......................................4

*Int'l Refugee Assistance Project v. United States Citizenship & Immigrations Services*, 551 F.Supp.3d 136 (S.D.N.Y, July 22, 2021)..............................................................1, 3

*Judicial Watch v. D.H.S.*, 895 F.3d 770 (D.C. Cir. 2018) ...........................................4, 5

*Nightingale v. USCIS*, 507 F.Supp.3d 1193 (N.D. Cal.)............................................1, 6, 7

*NY Legal Assistance Group v. Bd. of Immigration Appeals*, 987 F.3d 207 (2d Cir. 2021).............2

*Renegotiation Board v. Bannercraft*, 415 U.S. 1 (1974) ..................................................2

*Sanchez Mora v. U.S. Customs and Border Protection*, 3:24-cv-02430 (N.D. Cal., 11/4/2024)....2

**Statutes**

5 U.S.C. § 552(a)(6)(A)......................................................................................................5

5 U.S.C. § 704................................................................................................................ 2-3

**Rules**

Fed. R. Civ. P. 1...............................................................................................................10

Plaintiffs Reclaim the Records, Alec Ferretti, Alex Calzareth and Rich Venezia, by counsel, respectfully submit this reply memorandum of law in further support of their cross-motion for summary judgment.

## I. Preliminary Statement

This Defendant has now twice been found by District Courts to have engaged in a policy or practice of violating FOIA. Both of those cases apply here: *Nightingale v. USCIS* ordered the Agency to end its practice of withholding Agency A-file records in violation of the statutory requirements and to eliminate its backlog of A-file requests, and *IRAP v. USCIS* showed that the standard for a policy-or-practice claim long-established in the D.C. Circuit was applicable in the Southern District. Defendant ignores both cases, disingenuously shielding their failures to provide timely determinations to Plaintiffs' 89 FOIA requests by claiming that the efficiencies produced by the *Nightingale* order applied Agency-wide (which they did not), raising unsubstantiated excuses for their delays, and using unverifiable preliminary data and questionable handling of statistics to claim that its record for non-A-file production is improving, contrary to Plaintiffs' analysis of the Agency's own raw data.

Defendant's arguments fall apart under scrutiny, and fail to show a genuine dispute of the material facts here: the Agency has not complied with FOIA's timing requirements in processing Plaintiffs' requests, making out a practice of permitting egregious violations of the statute and causing continuing harm to Plaintiffs. Defendant has not met its burden, and Plaintiffs' cross-motion should be granted.

## II. Argument

**1. This Court has jurisdiction to decide this case**

Defendant's papers do not meaningfully engage with Plaintiffs' argument that the Court's equitable powers in FOIA cases are expansive, rather than limited to the several remedies

enumerated in the FOIA statute. "Once invoked, the scope of a district court's equitable powers … is broad, for breadth and flexibility are inherent in equitable remedies." *Brown v. Pleta*, 563 US 493, 538 (2011) (internal quote marks omitted). *See* Plaintiffs' Memorandum of Law in Opposition (Dkt. 50) ("Plaintiffs' Memo"), pp. 8-9. The approach taken by Defendant, drawn from Judge Menashi's concurrence in *ASPCA v. APHIS*, 60 F.4th 16 (2d Cir. 2023) (which Circuit Judges Leval and Parker declined to join, and which relied primarily on a single dissent in the DC Circuit), would abridge the Court's power, narrowing the "inherent powers of an equity court" cautioned against by *Renegotiation Board v. Bannercroft*, 415 U.S. 1, 20 (1974); *see also NY Legal Assistance Group v. Bd. of Immigration Appeals*, 987 F.3d 207, 217 n.20 (2d Cir. 2021). By contrast, the *per curiam* decision in *ASPCA* was open to hearing a policy or practice claim in the Second Circuit and to adopting the D.C. Circuit's analysis permitting broader equitable relief than what is outlined in the FOIA statute. Although the panel agreed with the District Court that the facts presented there – in which the Legislature had reversed the agency action at the core of the case, rendering most of the complaint moot – fell short of establishing such a claim, nothing in that decision cast doubt on the cognizability of a policy and practice claim in this Circuit. Plaintiffs' Memo, p. 9.

As to Defendant's assertion that the Administrative Procedure Act is the "appropriate vehicle" for litigating policy and practice claims (Defendant's Memorandum of Law in Further Support (Dkt. 53) ("Def. Reply"), p. 6), see the recent Northern District of California decision dismissing an APA claim in a similar FOIA action, noting that because "the APA limits judicial review to 'agency actions for which there is no other adequate remedy in a court'", "courts routinely dismiss APA claims seeking relief that is already available under FOIA." *Sanchez Mora v. U.S. Customs and Border Protection*, 3:24-cv-02430 at *4-5 (N.D. Cal., November 4, 2024)

(quoting 5 U.S.C. §704). In the Southern District, where the court has begun to recognize the validity of FOIA policy and practice claims (see *IRAP v. USCIS*, 551 F.Supp.3d 136 (S.D.N.Y. 2021)), the APA will not be the appropriate vehicle for litigating FOIA disputes.

Defendant, at Def. Reply p. 4, fn. 3, pointedly disavows its own tacit acceptance of policy and practice claims in *IRAP v. USCIS*, where this same Defendant did "not challenge the propriety of such claims". *IRAP*, 551 F.Supp.3d at 165. While the District Court in *IRAP* also observed that the Second Circuit "has not yet recognized the existence" of such a claim under FOIA, *id.*, this did not preclude Magistrate Judge Lehrburger from adopting the D.C. Circuit's standard set forth in *National Security Counselors, Payne* and *Newport Aeronautical*, and ultimately finding that "IRAP has thus adequately alleged that USCIS has a policy or practice of violating FOIA", *id.* at 165-66, and ordering declaratory and injunctive relief, *id.* at 172-73. It is of no consequence that *IRAP* predates the Second Circuit's *ASPCA* decision, as *ASPCA* did not categorically reject such claims.

Finally, Defendant seems to argue that the Second Circuit affirmed *ASPCA* because of a statement the plaintiff made at oral argument requesting an order for the defendant agency to comply with the FOIA, and that on this basis the present claim should be dismissed. Def. Reply, p. 6. This torqued reading of *ASPCA* entirely misses the limited point of that case – that where legislative action has reversed the policy or practice at issue, the claim will not survive. Defendant's unusual reading also ignores the specific demands for declaratory and injunctive relief articulated in the Request for Relief at the conclusion of Plaintiffs' Complaint, which are consistent with those ordered in *IRAP* (a declaration that Defendant's failures violated FOIA and an order to produce the requested records by a date certain). *See* Comp., Dkt. 1, p. 47.

3

2. **Dismissal of Plaintiffs' complaint is inappropriate**

Defendant misstates the legal standard for establishing a policy or practice claim based on delay. The "mere delay" cases Defendant cites at pp. 7-8 of its Reply Memorandum (copy-pasted from pp. 15-16 of its moving Memorandum) were all superseded by the D.C. Circuit's clear statement in *Judicial Watch* that "the plaintiff must allege a pattern of prolonged delay amounting to a persistent failure to adhere to FOIA's requirements and that the pattern of delay will interfere with its right under FOIA to promptly obtain non-exempt records from the agency in the future." *Judicial Watch v. D.H.S.*, 895 F.3d 770, 780 (D.C. Circ. 2018). Defendant repeats the phrase "mere delays" like a mantra throughout its Memorandum, aiming to diminish the severity of the violations present here. Defendant has flatly ignored statutory requirements in all 89 of Plaintiffs' requests for as long as three years, and continues to do so in Plaintiffs' other requests not within this litigation. See Plaintiffs' Memo, p. 12, and Declaration of Alex Calzareth (Dkt. 49) ("Calzareth Decl."), ¶¶31-32, 35 (describing extensive delays and continuing harm). Further, Defendant's cases do not approach the degree of egregious conduct presented here. See Pl. Memo, pp. 13-14. Plaintiffs have exceeded the policy or practice standard under *Judicial Watch*, and Defendant's motion to dismiss should be denied.

3. **Summary judgment should be denied for Defendant and granted for Plaintiffs**

Defendant's arguments for summary judgment do not withstand scrutiny, and likewise fail to meet its burden.

Defendant suggests that because violations of the timing requirements "'relate only to the requester's ability to get into court'", this is the only relief available when an agency repeatedly ignores the statutory deadlines. Def. Reply, p. 10 (quoting *Elec. Privacy Inf. Ctr. v. DOJ*, 15 F.Supp.3d, 32 (D.D.C. 2014)). Not so. The D.C. Circuit observed in 2018 that "[o]ur precedent on policy and practice claims disposes of any suggestion that Congress intended the repeated filing

of lawsuits to be a practical requirement for obtaining records from an agency flaunting the statute." *Judicial Watch*, 895. F.3d at 780 (also noting the "chilling effect that litigation costs can have on members of the public much less the burden imposed on the courts.") *Id*.

Defendant's assertion that Plaintiffs expect <u>production</u> of responsive records within the 20 or 30-day deadline is incorrect. Def. Reply, p. 10. The statute at issue, 5 U.S.C. §552(a)(6)(A)(1), requires an agency to provide notice of its determination whether to comply with a request within 20 days of receipt, extendable to 30, and Defendant has failed this requirement in every single request herein. In 89 requests, no determination "whether to comply with such request" (*id*.) was provided at all prior to filing this suit, with the delay extending well past a year on average. *See* Pl. Memo, p. 12, Plaintiffs' chart of the 89 requests here (Dkt. 48-1); *see also* Calzareth Decl., ¶¶31-32, 35. This, simply put, establishes a practice of persistent disregard of the statutory time requirements, casting doubt on the Agency's candor in declaring it "has made every effort to respond to all of Plaintiffs' requests as quickly as possible … within the statutory time frame." Def. Reply, p. 10.

Defendant's assurances that technological streamlining solutions have improved production flow carry little weight here. Def. Reply, pp. 10-11. Automated document collection systems may reduce the waiting time once required for the physical shipments of paper documents between agency offices, but nothing in Defendant's papers indicate that is the source of the extensive delays here. While these technological advances may help increase the overall volume of (primarily A-file) requests Defendant can process, they have done little to resolve the interminable delays of non-A-file requests at issue in this case.

Regarding Defendant's assertion that Plaintiffs should have tailored its Complaint specifically to non-A-file requests (Def. Reply, pp. 11-12): Plaintiffs' policy and practice claim is

5

not narrowly brought against the SIG unit dealing primarily with non-A-file requests, but against the Agency as a whole for practices that permit the egregious conduct alleged here, even though the handling of the 89 claims at issue was within the SIG unit's scope. In fact, the comparison between the Agency's handling of A-file requests versus non-A-file requests should concern the Court, where the *Nightingale v. USCIS* litigation has shown that the Agency is capable of meeting its statutory deadlines for A-file requests, while non-A-file requests continue to be "bottled up in limbo for months and years on end" (*CREW v. FEC*, 711 F.3d 180, 187 (D.C.C. 2013)). *See* Meyers Decl. ¶4 and Table 1, showing *Nightingale* reporting of 99% compliance rates for hundreds of thousands of A-file requests in the four most recent quarterly reports, and ¶8, analyzing FY 23 raw data showing that 48% of the 4,177 "COW"-prefixed (non-A-file) requests were backlogged and thus not in compliance with the statutory timing requirements.

These figures deflate Defendant's brief discussion (Def. Reply, p. 12) of the imprecise alignment between "COW" requests and the SIG unit. Plaintiffs acknowledge that some overlap with other FOIA units will undoubtedly occur (where, for example, the A-file of a prominent person is requested), but the Court should not lose track of the ball here: resources allocated to processing A-file requests have enabled the Agency to achieve spectacular compliance rates completely unmatched by the rates for non-A-file "COW" requests, whether handled by SIG or another unit. If any additional *Nightingale* resources are contributing to the processing of non-A-file requests, that impact has not been shown in the publicly available data. By contrast, the Senior Executive for USCIS has stated clearly that:

> <u>to maximize reduction of the A-file backlog</u>, USCIS also continues to contract for additional FOIA backlog work. As explained in my previous declaration, USCIS extended its backlog contract in which contractors <u>contribute towards the processing of A-file FOIA requests</u> through March 29, 2024. [. . .] USCIS has now also exercised an option period for additional contract work to be

6

> completed from March 30, 2024 through March 29, 2025. Due to the steep influx of new A-file FOIA requests during this reporting period, USCIS also modified its contract to increase the amount of cases the contractor can complete during the current period of performance, and the contractor has extended overtime to its staff <u>to allow for the completion of additional A-file FOIA cases</u>.

*Nightingale v. USCIS*, Case No. 3:19-cv-03512-WHO, Fifteenth Declaration of Tammy M. Meckley, ECF No. 167-1, March 22, 2024, ¶16 (emphasis added). *See also* Pl. Memo, p. 22.

Defendant, not Plaintiff, has ignored any actual data supporting its claims of three factors contributing to delays: requests awaiting input from other agencies, requests where the time to respond has been tolled, and requests where rolling production has begun. Def. Reply, p. 12. Plaintiffs cannot ignore something of which they have no knowledge, and insofar as these factors are not part of the published raw data, there could be no expectation that Plaintiffs would have knowledge of this data. On the other hand, these categories of data are well within Defendant's record-keeping, and could have been produced here had they chosen to do so. For example, the "Raw Data Requests" tab in the Fiscal Year ("FY") 2023 spreadsheet[1] contains a Column K captioned "Days case was on hold", which may indicate the duration of any tolling applied. This column is entirely blank, indicating either that none of the nearly 418,000 requests recorded in that spreadsheet were tolled, or (more likely) that this data was withheld from public release, though known by the Agency.

Plaintiffs' inability to analyze the "Preliminary" FY 24 data creates a fundamentally unfair asymmetrical access to data. The Court should not accept Defendant's preliminary data because it has not been finalized, made available for public review, and because its reliability is uncertain. Additionally, the preliminary data presented in the Baxley Reply Declaration (Dkt. 54), ¶20 and

---

[1] *Available at* https://www.dhs.gov/publication/annual-foia-report-raw-data (last accessed December 2, 2024).

the Def. Reply Memo at pp. 12-13 beg for closer review, as they show an exponential increase of 6,618 "COW" requests between FY23 and 24, compared to an increase of only 190 requests in the prior year.[2] These numbers are wildly inconsistent with the concurrent increases in the number of A-file requests reported by the Agency pursuant to the *Nightingale* order, and collected in the Meyers Declaration (Dkt. 48) at p. 4, table 1.[3] There the number of A-file requests received increased from approximately 294,809 in FY 22 to 381,487 in FY 23, and to 546,809 in FY 24. This increase of 29.4% in FY 23 and of 43.34% in FY 24 is massively disproportionate to the 281.62% increase in "COW" requests reportedly occurring between FY 23 and 24. *See* fn. 2. In the absence of further explanation for the vast increase in requests assigned a "COW" prefix in FY 24, Plaintiffs' concerns about the reliability of the data are justified.

Additionally, the calculation of "'COW' Requests Processed within FY" (Baxley Reply Decl., ¶20 and chart) appears to omit most requests which have been moved to the litigation track, artificially lowering the reported backlog without closing requests. By counsel, the instant case was filed on March 8, 2023, in FY 23. At that time, the 67 requests made prior to the beginning of FY 23 appeared in the FY 22 raw data, but only 16 of those requests appear in the FY 23 raw data, the other 51 having been removed, along with nearly all requests submitted in FY 23. If this removal of requests in litigation from the raw data is the consistent practice of the Agency, this practice allows the backlog statistics to show improvement where it is unwarranted. While the preliminary FY 24 backlog (1,803) thus appears to show a reduction from the previous year

---

[2] Although not provided in the Baxley Reply Decl. chart at p. 7, the number of new COW requests received in FY 23 and in the preliminary FY 24 figures can be calculated by subtracting the pending requests at the end of the previous FY from the figure in the "'COW' Requests Received within FY and Pending from prior FYs" column. Accordingly, in FY 23 there were 2,350 COW requests received (4,177 – 1,721 – 106), and in FY 24 8,968 COW requests received (11,124 – 2,006 – 150). This is an increase in FY 24 of 6,618 COW requests, or a 281.62% increase.

[3] As noted in the Meyers Declaration, p. 4, because the *Nightingale* reporting period is 15 days out of synch with the federal fiscal year, those figures are inexact but approximate.

(2,006), this may be significantly due to other litigated requests being removed from the raw data analysis, not because of increased Agency workload efficiencies. Defendant's assertion that "the Agency ... has meaningfully reduced the number of 'COW' requests pending beyond 30 business days", Def. Reply, p. 12, misrepresents the statistics, and should not be credited.

Finally, even if the preliminary FY 24 data in the Baxley Reply Declaration is accurate, the steep increase in "COW"-prefixed requests received was precisely matched by the number of requests processed (both increased by approximately 7,000 requests). However, this surge in activity barely cut into the backlog of overdue requests, which Defendant admits was reduced only by about 10% (from 2,006 to 1,803 requests). It would be consistent with prior fiscal years if the vast majority of "COW"-prefixed requests were closed within several days of receipt for reasons not requiring the production or review of Agency records: erroneous or duplicate requests, requests for non-Agency records, and requests which were redirected to other agencies or referred to other DHS components.[4] If most of the purported sharp increase of requests in FY 24 were closed without reviewing or producing records, this says nothing about Agency processes becoming more efficient where the actual production of records and elimination of backlog is concerned. Without providing Plaintiff with access to the finalized FY 24 raw data for a fair analysis of how requests were disposed, the reliability of Defendant's assertions cannot be confirmed.

Defendant does not contest that it has persistently and egregiously failed to meet the FOIA statutory requirement to give notice of its determination within 20 or 30 days for Plaintiffs' 89 requests, nor has not convincingly shown a reduced backlog of non-A-file FOIA requests. Defendant has not met its burden at summary judgment. Plaintiffs' cross-motion should be granted.

---

[4] The list of potential dispositions upon closing a request can be viewed in the FY 23 Raw Data spreadsheet at Column O, "Disposition".

9

**4. Plaintiffs' claims should not be severed**

Severance of the 89 claims into 89 different judicial dockets would be inconsistent with Federal Rule of Civil Procedure 1, as it would reduce efficiencies for everyone involved, especially as the Agency has already made "65 productions of responsive records and completed its responses to 55 of the 89 requests involved" (Baxley Reply Decl., ¶22). Between the many judges and clerks and the array of government attorneys assigned to the 89 different cases, a uniform approach to resolving the cases would be unlikely, resulting in inconsistent outcomes. Defendant has shown that it is capable of responding to Plaintiffs' requests when it puts in the resources to do so, and severing the case now that the production of responsive documents is underway would undermine that production effort. Keeping the claims together when the finish line is approaching is, Plaintiff respectfully suggests, the more efficient approach to a fair and consistent resolution of the matter.

### III. Conclusion

For the preceding reasons, Defendant has failed to meet its burden on its motion, and Plaintiffs' cross-motion for summary judgment should be granted.

Dated:    December 6, 2024
          New York, New York

                                        Respectfully submitted,

                                        BELDOCK LEVINE & HOFFMAN, LLP
                                        99 Park Avenue, PH/26th Floor
                                        New York, New York 10016
                                        *Attorneys for Plaintiff*

                                        By:_____
                                        Benjamin Meyers, Of Counsel
                                        t: 646-496-2353
                                        e: ben.meyers.esq@proton.me

                                        David B. Rankin
                                        t: 212-277-5825
                                        e: drankin@blhny.com